John HILL, M.D. *v.* Anita BILLUPS, Individually and as Next Friend of Stephon Earl Billups, Deceased

CA 05–19                                    212 S.W.3d 53

Court of Appeals of Arkansas
Opinion delivered September 7, 2005

*Baker & Whitt,* by: *Darrell Baker;* and *Watts, Donovan & Tilley, P.A.,* by: *David M. Donovan,* for appellant.

*Johnson, Odell & Kendall,* by: *Linda Kendall Garner* and *Patricia A. Odell,* for appellee.

OLLY NEAL, Judge. This is the second time that this medical malpractice case has been before our court. On December 3, 1995, appellee Anita Billups brought her thirteen-day-old son, Stephon Billups, into the emergency room at Baptist Memorial Hospital in Forrest City, where he was treated by appellant, Dr. John Hill, a board-certified pediatrician. After examining Stephon, appellant discharged him and instructed appellee to give Stephon "Tylenol as needed" and Pedialyte. The following morning, after discovering that Stephon had stopped breathing, appellee returned to the emergency room with Stephon. Stephon was transferred to Arkansas Children's Hospital. Stephon died on December 6, 1995, as a result of a bacterial infection.

Subsequently, appellee filed suit, individually and as next of friend of Stephon, alleging medical malpractice. The case was tried to a jury February 19-26, 2003, in the St. Francis County Circuit Court. The jury returned a verdict for appellee in the amount of $250,000. Appellant appealed the verdict to this court. He alleged the following errors: (1) the trial court erred in excluding the

deposition of his expert witness; (2) the trial court should have excluded the testimony of appellee's expert witness because of a failure to disclose changed opinion testimony; (3) during voir dire, the jury was improperly influenced by a reference to medical malpractice insurance.

In *Hill v. Billups*, 85 Ark. App. 166, 148 S.W.3d 288 (2004), we agreed with appellant's assertion that the trial court had erred when it refused to rule on the admissibility of the deposition testimony of appellant's expert witness and remanded that portion of the case back to the trial court.[1] Upon remand, the trial court found that appellant's expert witness was not qualified to offer expert testimony, and therefore, excluded her deposition. Appellant now argues that the trial court abused its discretion when it excluded the testimony of his expert witness. We affirm.

Whether a witness qualifies as an expert in a particular field is a matter within the trial court's discretion, and we will not reverse such a decision absent an abuse of that discretion. *Brunson v. State*, 349 Ark. 300, 79 S.W.3d 304 (2002). Rule 702 of the Arkansas Rules of Evidence provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Rule 702 expressly recognizes that an expert's testimony may be based on experience in addition to knowledge and training. *Arrow Int'l v. Sparks*, 81 Ark. App. 42, 98 S.W.3d 48 (2003).

If a reasonable basis exists demonstrating that a witness has knowledge of a subject beyond that of ordinary knowledge, the evidence is admissible as expert testimony. *Id.* There is a decided tendency to permit the fact-finder to hear the testimony of persons having superior knowledge in a given field, unless they are clearly lacking in training and experience. *Id.* The fact that a medical expert is not a specialist in that particular field does not exclude that medical expert from offering testimony. *See First Commercial Trust Co. v. Rank*, 323 Ark. 390, 915 S.W.2d 262 (1996).

Appellant sought to introduce the deposition testimony of Dr. Rani Lewis, assistant professor in the OB/GYN Department at

---

[1] We affirmed appellant's remaining two points.

Vanderbilt University Medical Center in Nashville, Tennessee. Dr. Lewis's specialty is high-risk-maternal fetal medicine, which involves the care of either mothers or babies who are at high risk during the course of the mother's pregnancy. She said that she regularly saw mothers and babies who were at great risk for infection. While at the University of Tennessee in Memphis, Dr. Lewis cared for mothers and babies who had problems frequently associated with infection. Dr. Lewis has published numerous papers in peer review journals relating to infection issues, including HIV, as well as pre-term labor and pre-term premature rupture of membranes. Although she had previously practiced in Memphis, Dr. Lewis did not have a direct history of treating infants in the Forrest City area. Because her training included emergency-room treatment, Dr. Lewis was confident that she was familiar with the standard of care required of an emergency-room physician seeing a neonate. She explained that "in obstetrics and gynecology, in labor and delivery service, we act as our own ER physicians for the patient population."

Dr. Lewis testified that, in her current practice, she spent two days a week doing ultrasounds and tests on mothers and one day a week seeing patients in her private practice. She said that her current practice involved the examination of a few babies. Occasionally, Dr. Lewis will see a baby when its mother brings it in for evaluation. During her testimony, Dr. Lewis stated:

> In 1995 I was at the University of Tennessee. We did approximately ten thousand deliveries a year. So that would be thousands of moms. I cannot estimate exactly how many of those babies I saw and took care of. Generally if I was examining a baby for a circumcision we would take the baby, undress it, check the vitals. *I don't do vitals on neonates.* I just make sure by visual findings that there's no evidence of any neonatal infection. I check for appropriate reflexes, skin turgor, tone.

[Emphasis added.] She explained that she did not perform vitals on neonates because that was a function for the nurses. However, she said that she could possibly do the vital signs.

As to the appropriate standard of care, Dr. Lewis stated:

> I'm not aware of the standard of care specifically in the Forrest City area, but the standard of care for emergency room physicians taking care of any patient requires the ability to obtain as much

information as you can objectively and subjectively. Generally, in the United States, the thing that we do most frequently as [sic] regards to examination of the infant is the APGAR scores which checks the baby's reflexes, baby's respirations, whether the baby can flex and extend. That can give a lot of information regarding how well the baby is doing.

Generally, the care of a baby is turned over to a pediatrician. Obstetricians tend to pass the babies on to pediatricians who take care of children. *I don't take care of children, I take care of pregnant women and their infants in utero, although I have had multiple opportunities to evaluate the child in my care of the patient.* The standard of care relates to how a group of your peers would act in a similar situation. So if you're talking about a group of OB/GYN peers, I imagine that it is similar to how a group of pediatric peers act in a similar situation. But they would be taking care of different patients. I am a perinatologist, which is the same thing as a high risk fetal medicine sub-specialist. A group of peers for a pediatrician is going to be very different from a group of peers for an obstetrician. I'm not qualified to articulate a standard of care for pediatricians. I was not articulating a standard of care for pediatricians in the Forrest City area.

[Emphasis added.]

In its October 4, 2004 order, the trial court wrote the following:

Stephon Earl Billups, the deceased, was a thirteen-day old neonate. The court finds that Dr. Rani Lewis admits that she does not perform vital signs on neonates and is thus not qualified to render competent expert opinion on the examination of the thirteen-day old neonate in the instant case. Uniquely critical to the case is what were the vital signs of the neonate at the time of the examination by Dr. John Hill.

. . . .

The Court is also cognizant that, in the first trial of this case, the defendant's attorney, Mr. Darrell Baker, stipulated that Dr. Rani Lewis was not an expert in pediatrics. That stipulation, coupled with the admission and testimony of Dr. Lewis as set forth above, persuades this court that the 2003 deposition of Dr. Rani Lewis is properly excluded under the Rules as that [sic] Dr. Lewis is not qualified to render an expert competent expert opinion concerning the examination of the thirteen-day old neonate, Stephon Earl Billups, deceased.

. . . .

Accordingly, this court finds that the February 2003 deposition is not admissible. Although highly qualified to offer expert testimony on emergency-room care, Dr. Lewis was not an expert in the matter currently before the court. Dr. Lewis testified that, in her practice, she does not perform vitals on neonates nor does she examine children. Therefore, she was not knowledgeable in the matter before the court. Based on this evidence, we hold that the trial court did not abuse its discretion when it excluded Dr. Lewis's testimony.

Affirmed.

GLADWIN and BAKER, JJ., agree.